Filed 2/29/16  In re A.R. CA2/8

# NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## SECOND APPELLATE DISTRICT

## DIVISION EIGHT

| | |
|---|---|
| In re A.R., a Person Coming Under the Juvenile Court Law. | B265399 |
| LOS ANGELES COUNTY DEPARTMENT OF CHILDREN AND FAMILY SERVICES,<br><br>        Plaintiff and Respondent,<br><br>        v.<br><br>J.R.,<br><br>        Defendant and Appellant. | (Los Angeles County Super. Ct. No. DK09673) |

APPEAL from orders of the Superior Court of Los Angeles County.  Stephen Marpet, Juvenile Court Referee.  Affirmed.

Cristina Gabrielidis, under appointment by the Court of Appeal, for Defendant and Appellant.

Mary C. Wickham, Interim County Counsel, Dawyn R. Harrison, Assistant County Counsel, and Julia Roberson, Deputy County Counsel, for Plaintiff and Respondent.

\* \* \* \* \* \* \* \* \* \*

Mother J.R. appeals from the juvenile court's jurisdictional findings under section 300, subdivisions (b) and (j) of the Welfare and Institutions Code[1] as to now one-year-old A.R., claiming there was not substantial evidence that her drug history, mental health history, or her previous arrest for burglary and contributing to the delinquency of a minor (A.R.'s half sibling) put A.R. in substantial risk of harm. Mother does not challenge the juvenile court's dispositional orders. Because mother does not challenge the juvenile court's jurisdictional findings based on father's drug use and participation in the burglary, which father has not appealed, we find her challenge to jurisdiction is nonjusticiable. And, in any event, mother's claims fail on the merits, as there was substantial evidence that mother's unresolved issues placed newborn A.R. at risk of harm.

## FACTUAL AND PROCEDURAL BACKGROUND

The family came to the attention of the Los Angeles County Department of Children and Family Services (Department) on February 20, 2015 after mother tested positive for PCP at the birth of A.R., and was "cursing" at the nurses during the delivery. At the time of A.R.'s birth, mother was 19 years old. A.R. was born full term with a good Apgar[2] score and no complications. According to the reporter, mother admitted having a substance abuse history of smoking PCP and marijuana, but denied current use (despite her positive test for PCP at A.R.'s birth). Mother had tested positive for marijuana at a prenatal visit in November 2014 when she was six months pregnant, but said she stopped using when she was warned that testing positive at delivery would result in her baby being taken away. Mother claimed she had been exposed to second-hand PCP smoke, stating that her "sister-in-law . . . uses PCP and [she's] always around her."

---

[1]    All further statutory references are to the Welfare and Institutions Code unless otherwise indicated.

[2]    Dr. Virginia Apgar introduced the Apgar score in 1952 as a method to quickly summarize the health of newborn children at one and five minutes after birth <https://www.nlm.nih.gov/medlineplus/ency/article/003402.htm> (as of Feb. 29, 2016).

2

She also stated that her neighbors smoked PCP. Father had been in prison since November 2014, and mother was currently residing with paternal grandmother.

Father had an open family reunification case with the Department for two of his other children, A.R.'s half siblings P.S. and R.S. Father is a heroin addict and a White Fence gang member.

Department social workers visited the hospital on February 20, 2015, and spoke with Nurse Fatima, mother's and A.R.'s attending nurse. Mother had tested positive for PCP and Benzodiazepines. A.R.'s test results were still pending. A.R. had been fussy and was being monitored for withdrawal symptoms, but no withdrawal symptoms were noted in his chart.

The social workers interviewed mother. She said she did not want to lose her child to the foster care system, and that she wanted to care for A.R. Mother said she was currently living with paternal grandmother and paternal aunt and denied that anyone in the home used drugs. Father was in custody for robbery but mother said she planned to raise A.R. with him after his release. Mother denied any knowledge of why his other children were detained from him. She denied any gang involvement or knowledge that father was involved in a gang.

Mother denied currently using drugs. She admitted to past drug use, but decided to "get clean for her baby" when she found out she was pregnant in June or July 2014. She decided to stop using marijuana in October 2014. Mother was willing to take random drug tests and enter an inpatient program if it would allow her to keep her baby.

Mother had been a dependent child. She was detained at the age 12 or 13 because of physical and sexual abuse by her stepfather. Mother had a number of foster placements from which she had run away. After she turned 18, her case was closed because she missed a court date. Mother also had a juvenile criminal history for tagging, and a June 2014 arrest for shoplifting with father, for which she served a week in jail and was currently on probation.

As a teenager, mother was diagnosed with depression and bi-polar disorder, and was required to take Prozac by the juvenile probation department. Mother was not

currently taking medication, but admitted that "at times she feels depressed and her last depression episode was a month ago, where she was feeling down and wanted to run away." Mother denied having any feelings of wanting to hurt herself of others during the episode. She also denied currently wanting to run away.

Social workers, accompanied by law enforcement, visited paternal grandmother's home on February 20. There were three young men sitting on the porch, in gang attire, who scattered upon seeing police. Living in the home were paternal grandmother, two paternal aunts, a paternal uncle, and three children belonging to one of the paternal aunts. There was alcohol on paternal grandmother's breath; she admitted to drinking "gin and juice," but denied being drunk. Paternal grandmother denied any drug use by mother. A walkthrough of the home revealed gang tagging, large roaches, and no running hot water. The social worker saw several people lounging near the home's garage who appeared to be gang affiliated.

A removal order for A.R. was issued on February 20. On February 21, the hospital reported that A.R.'s drug screen was negative.

When served with the removal order, mother was disappointed but calm. She was willing to participate in programs to have A.R. placed with her.

On February 22, the Department received mother's results from her second drug test; they were positive for PCP but negative for Benzodiazepines.

Further investigation revealed that mother had an extensive criminal history consisting of two arrests for assault with a deadly weapon, arrests for battery on a peace officer, failure to obey orders of the juvenile court, and contributing to the delinquency of a minor.

Father, who was born in 1962, had a decades long criminal history beginning in 1978, with arrests for robbery, drug possession, attempted murder, battery, receiving stolen property, assault with a deadly weapon, among other crimes.

At the February 25, 2015 detention hearing, the juvenile court ordered A.R. detained in foster care, as mother had not identified any available family members with

whom A.R. might be placed, and ordered that mother was to receive a minimum of three 3-hour monitored visits per week.

The March 25, 2015 jurisdiction/disposition report included additional information. A referral for A.R.'s half siblings, P.S. and R.S., had been generated on June 16, 2014, when mother and father were caught shoplifting at Walmart. Mother had encouraged P.S. to place merchandise in a cart, and to leave the store without paying. Father was waiting for them in the car, and was under the influence of heroin. Both mother and father were arrested, and a dependency case was opened as to P.S. and R.S.

The police report for the June 2014 shoplifting incident revealed that when 10-year-old P.S. was interviewed by police, she started crying and said that mother "made" P.S. carry merchandise out of the store. According to P.S., father did not tell her to steal any merchandise. When mother, father, and P.S. were confronted by loss prevention associates outside of the store, mother tried to walk away and was uncooperative. Father appeared to be under the influence of opiates and admitted to police that he had injected heroin that morning. He also admitted to being a member of the White Fence gang with a moniker of "Chopper." Mother admitted to police that she showed P.S. how to steal because she wanted P.S. to have "nice things too."

Mother reported she had moved out of paternal grandmother's home because it "was not the best environment for [her] and [her] son" and was renting a room for $450 per month. Mother remained in contact with father. Mother had enrolled in parenting and substance classes at Homeboy Industries. She tested negative for drugs on February 24, March 5, and March 11, 2015.

According to the Department's April 27, 2015 jurisdiction report, mother informed the Department that she was interested in coming back into the foster care system to receive additional support. All of mother's drug tests during the reporting period were negative.

A Multidisciplinary Assessment Team (MAT) summary of findings for A.R. noted that A.R.'s foster mother reported concerns about A.R. A.R. had some sleeping and eating difficulties, was very fussy, and would sometimes become tense and rigid

while feeding.  The assessor observed A.R. to be difficult to soothe.  The assessor believed that A.R. "presented with symptoms/behaviors impacting his daily functioning."

The court sustained the following allegations in the petition, as to mother:

> "[Under section 300, subdivision (b),] mother . . . has a history of illicit drug use and is a recent user of marijuana, which renders the mother incapable of providing regular care and supervision of the child.  On 11/20/2014, the mother had a positive toxicology screen for marijuana, while the mother was pregnant with the child.  The mother abused marijuana during the mother's pregnancy with the child.  The child is of such a young age that he requires constant care and supervision.  Due to the mother's illicit drug use, she is unable to provide for the child's constant care and supervision.  The mother's illicit drug use endangers the child's physical health and safety and places the child at risk of serious physical harm, damage and danger."[3]

> "[Under section 300, subdivision (b),] mother . . . has unresolved mental and emotional problems, including a diagnosis of Bi-Polar Disorder and depression, which renders the mother incapable of providing regular care for the child.  The mother failed to take the mother's psychotropic medication as prescribed.  Such mental and emotional problems on the part of the mother endanger the child's physical health and safety and place the child at risk of serious physical harm, damage, and danger."

> "[Under section 300, subdivision (j),] mother . . . and father . . . created a detrimental and endangering situation for the child's half-sibling, [P.S.] in that the mother and father committed the act of theft while the child's half-sibling, [P.S.] was in the father's care and supervision.  The mother was arrested for Burglary and Contribute [*sic*] Delinquency of Minor.  Such a detrimental and endangering situation established for the child by the mother and father endangers the child's physical health and safety, and creates a detrimental home environment, placing the child at risk of serious physical harm, damage and danger."

The juvenile court also sustained allegations as to father's substance abuse, and that father was under the influence of drugs while A.R.'s half sibling, P.S., was in his

---

[3]    No allegations were sustained based on mother's positive drug test at A.R.'s birth, because notwithstanding the initial positive test, a "drug confirmation" test administered by the hospital was ultimately negative for PCP.

6

care.  Mother was ordered to participate in drug and alcohol testing, a full drug and alcohol program with aftercare, parenting classes, mental health counseling, and individual counseling.  Her visits with A.R. were ordered to be monitored, but the Department was given discretion to liberalize mother's visits.

We granted mother's request that we take judicial notice of the court's post-appeal order of July 31, 2015, returning A.R. to mother's care on the condition that she comply with her drug treatment program and drug testing.

**DISCUSSION**

Mother contends the jurisdictional findings are unsupported.  She contends that there is no evidence of a *current* risk to A.R. based on any of the findings.

Because mother does not challenge the jurisdictional findings as to father, mother's challenge to jurisdiction based on her drug use, mental health, and endangerment of A.R.'s half sibling is nonjusticiable.  (*In re I.A.* (2011) 201 Cal.App.4th 1484, 1490-1491; see also *In re Jonathan B*. (1992) 5 Cal.App.4th 873, 875 ["[A] reviewing court may affirm a juvenile court judgment if the evidence supports the decision on any one of several grounds"].)  Mother acknowledges that her claims are nonjusticiable, but asks this court to reach the merits of her claims, reasoning that the findings have prejudiced her by impacting her custody of A.R., have resulted in monitored visitation, and have "necessarily impacted [mother's] reunification with her son, and may impact any future dependency actions involving [mother] and [A.R.], or any future children [mother] may have."

An appellate court may, within its discretion, address the  merits of the jurisdictional findings against one parent where "the finding (1) serves as the basis for dispositional orders that are also challenged on appeal [citation]; (2) could be prejudicial to the appellant or could potentially impact the current or future dependency proceedings [citations]; or (3) 'could have other consequences for [the appellant], beyond jurisdiction' [citation]."  (*In re Drake M.* (2012) 211 Cal.App.4th 754, 762-763.)

Mother has not demonstrated any prejudice warranting a review of her claims.  First, mother has not challenged any of the juvenile court's dispositional orders on

7

appeal.  Also, after the filing of this appeal, A.R. was returned to mother's care.  Lastly, any concern about the impact of the findings on future proceedings is highly speculative. (*In re C.C.* (2009) 172 Cal.App.4th 1481, 1489; see also *In re I.A.*, *supra*, 201 Cal.App.4th at p. 1495.)

And, in any event, the standards for juvenile court jurisdiction under section 300, subdivisions (b) and (j) are well settled.  (See *In re Rocco M.* (1991) 1 Cal.App.4th 814, 820; *In re Cole C.* (2009) 174 Cal.App.4th 900, 916.)  As detailed above, mother has a significant substance abuse history and used marijuana while she was pregnant, associated with drug users and gang members during her pregnancy and after A.R.'s birth, suffered from mental health issues that made her depressed, and encouraged A.R.'s 10-year-old half sibling to shoplift.  Even though mother had made significant progress to getting her life on track after the Department became involved with her family, there was substantial evidence of a current risk to her newborn child.

## DISPOSITION

The jurisdictional orders are affirmed.


GRIMES, J.


We concur:


BIGELOW, P. J.



RUBIN, J.


8